IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **MICHELLE A. GORDON**<br>24 Kfar Ivri, Apt. 3<br>Neve Yaakov, Jerusalem<br>Israel<br><br>       Petitioner,<br><br>v.<br><br>**MATHIEU GRUNIN**<br>3682 Shannon Road<br>Cleveland Heights, Ohio 44118<br><br>       Respondent. | *<br><br>*<br><br>*<br><br>*     Civil No.:<br>*<br><br>*<br><br>*<br><br>*<br><br>* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**VERIFIED PETITION FOR RETURN OF CHILDREN TO ISRAEL
AND ISSUANCE OF SHOW CAUSE ORDER**

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001** *et seq*.

### INTRODUCTION

1.  Petitioner, Michelle A. Gordon (the "Mother"), by and through her undersigned attorneys, files this Verified Petition for Return of Children to Israel (hereinafter "Petition"), against the Respondent, Mathieu Grunin (the "Father").

2.  The Petition is filed as a result of the Father's wrongful retention of the parties' children, S.G., born in 2009, and Z.G., born in 2014, in the United States from Israel.

3.  The Father has retained the children from their proper custody and habitual residence jurisdiction of Israel. The retention began on or about May 24, 2019.

1

4. This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act[2] (hereinafter "ICARA").

5. The Convention came into effect in the United States of America on July 1, 1988, and was ratified between the United States of America and Israel on December 1, 1991.[3]

6. The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Convention, art. 1.

## JURISDICTION

7. This Court has jurisdiction under ICARA § 9003(a) & (b) because: (a) the United States district courts have concurrent original jurisdiction (along with the courts of the States) over claims made under the Hague Convention; and (b) the children at issue here are currently physically located within the Northern District of Ohio.

## FACTS

8. The Mother and Father were married in a civil ceremony in New York, New York on March 27, 2008 and in a religious ceremony in Chicago, Illinois on April 6, 2008.

---

[1] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10,493 (1986), text available at: https://www.hcch.net/en/instruments/conventions/specialised-sections/child-abduction (last accessed November 13, 2019).
[2] 22 U.S.C. 9001 *et seq.* (2016).
[3] *See* Hague Abduction Convention Country List, text available at: https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last accessed November 13, 2019).

9. In August 2008, when the Mother had completed her internship at the State University of New York, the parties moved together from the United States to Israel to start their married life together in Israel. After the parties' marriage, the parties lived together in Jerusalem, Israel.

10. The Father is a Talmudic scholar.

11. The Mother is a geneticist specializing in the study of age-related macular degeneration, and former adjunct professor in Hadassah Academic College and Touro College Israel, located in Jerusalem, Israel. As fully explained below, the Mother is currently participating in a temporary post-doctoral fellowship position at Case Western Reserve University.

12. The parties' daughter, S.G., was born in 2009 in Israel.

13. The parties' son, Z.G., was born in 2014 in Israel.

14. The Mother and Father are both named as the children's parents on the children's birth certificates.

15. After the children's respective births, the family continued to live together in Israel in an apartment they own located at 24 Kfar Ivri in Jerusalem.

16. The Father continued to be engaged as a Talmudic scholar in Israel after the children's respective births. The Mother took maternity leave after each child's birth and after each period of maternity leave had ended she resumed her work as a geneticist and university professor in Jerusalem.

17. The Mother, Father, and children all receive medical, dental, and vision care in Israel through Israel's comprehensive national healthcare system. They have primary care physicians and dentists in Israel and receive routine medical, dental, and vision care in Israel. The

family maintains medical, dental, and vision insurance in Israel. The Mother and Father are both fully involved in the children's health care in Israel.

18. The Mother, Father and children are engaged and active members of their local neighborhood and religious community in Israel. The parents and children have extended family and many friends in their community in Israel and participate regularly in community and religious activities in Israel.

19. From May 6-11, 2017, the Mother attended a conference of the Association for Research in Vision and Ophthalmology conference in Baltimore, Maryland. At the conference, the Mother learned of a potential opening for a temporary post-doctoral fellow position at Case Western Reserve University studying and working under Dr. Jonathan L. Haines in the Department of Population & Quantitative Health Sciences. The temporary post-doctoral fellowship is a prestigious and highly sought-after position to learn and advance a career in the Mother's field.

20. It is common practice in the Mother's field in Israel, and the only pathway to obtain a tenured track professorship position in Israel, to travel abroad for temporary post-doctoral fellowships. The fellow then returns to the fellow's home university to apply the knowledge and experience gained in the temporary fellowship abroad.

21. After the conference the Mother returned home to Israel and discussed the temporary opportunity with the Father. The Father was reluctant for the Mother to apply for the temporary fellowship because he did not want to leave Israel.

22. The parties then decided that the Mother would apply for the temporary fellowship abroad, even though the Father was reluctant, so that she would not miss the application deadline while the parties continued to discuss the opportunity.

4

23. On or about June 28, 2017, the Mother interviewed by telephone for the temporary fellowship.

24. The telephone interview went well and in August 2017 the Mother persuaded the Father to travel with her and the children to the United States for a vacation to visit relatives in the United States. She also persuaded the Father to visit Cleveland to help inform the family's decision on whether the Mother should continue to pursue the temporary fellowship opportunity.

25. Shortly thereafter, the Mother was offered the temporary post-doctoral fellowship position at Case Western Reserve University.

26. The temporary post-doctoral fellowship was initially offered for a period of one year with the potential to renew the position for one additional year if the University approved the Mother's performance in the position. The temporary post-doctoral fellowship also had the potential to be renewed for additional time if the Mother was able to independently obtain funding through research grants to fund her position after the initial two-year (subject to performance approval) period.

27. The Mother and Father discussed the opportunity at length. The Mother anticipated that she would perform well and would be offered the second year extension. She also anticipated that she might be able to obtain grants for a third year, but made clear to the Father that such an extension was not guaranteed, and that she was unlikely to obtain such funding. In their discussions, the parties both affirmed that the temporary post-doctoral fellowship in Cleveland would last for two years with the potential for a third year.

28. The Mother and Father also discussed the opportunity at length with their family, friends, and rabbis.

29.     The Father continued to be reluctant for the Mother to accept the temporary post-doctoral fellowship in Cleveland. He continued to be hesitant about leaving Israel.

30.     By the end of the summer of 2017, the Father still had not agreed to the Mother accepting the temporary post-doctoral fellowship or the family temporarily living in Cleveland for approximately two years.

31.     The Mother therefore accepted two teaching positions in Israel for the October 2017 through January 2018 university semester.

32.     The Mother is the sole source of income for the family. As a full-time Talmudic scholar, the Father earns only a minimal stipend. The Mother must financially support the family. She therefore had to ensure the family would have income regardless of whether or not she accepted the temporary post-doctoral fellowship position.

33.     In the fall of 2017, Case Western Reserve University began to press the Mother for a decision on whether she would accept the temporary post-doctoral fellowship position. The University understood that the Mother had accepted the two other teaching positions in Israel to ensure she could support her family.

34.     Case Western Reserve University therefore agreed that if the Mother accepted the temporary post-doctoral fellowship position, she could start on February 1, 2018.

35.     The Mother and Father further discussed the revised offer and start date. They ultimately agreed that the Mother would accept the temporary post-doctoral fellowship position and that the family would temporarily live in Cleveland, Ohio for approximately two years, with the potential to extend for a third year depending on grant funding availability for the Mother.

36. The Mother and Father agreed that the family would return home to live in Jerusalem, Israel at the conclusion of the Mother's temporary post-doctoral fellowship.

37. The Mother located an appropriate neighborhood in the Cleveland area for the family's temporary stay and rented a home there for the family. A local non-profit agency provided furnishings for the family's rented home in the Cleveland area.

38. The Mother and Father enrolled the children in an appropriate local school in Cleveland for the period of the family's temporary stay in Ohio.

39. In Israel the parties had worked together to rent out their apartment to tenants for the period of the family's temporary stay in Ohio. The parties rented their apartment in Israel fully furnished (with all of the family's furnishings and appliances) so that the apartment will be as they left it when they return home to Israel at the conclusion of the temporary post-doctoral fellowship.

40. The parties stored additional small personal items in their upstairs neighbor's home in Israel so that the items would be easily accessible upon the family's return home to Israel at the conclusion of the temporary post-doctoral fellowship.

41. The parties stored additional large personal items, including any furnishings and appliances that the renters did not want to use, in a storage unit the parties own in Israel. The items will also be easily accessible upon the family's return home to Israel at the conclusion of the temporary post-doctoral fellowship.

42. After all of the logistical arrangements for the temporary post-doctoral fellowship in Ohio had been agreed between the parties and organized, the family travelled from Israel to Ohio on January 29, 2018 to begin the two-year temporary post-doctoral fellowship. The family

only brought clothing, books, and personal items (*e.g.,* children's comfort toys) with them to Ohio. All of their substantial possessions remain at their home in Israel.

43. The Mother and Father told their family, friends, and rabbis in Israel that they were going to Ohio for approximately two years for the temporary post-doctoral fellowship.

44. There was no "going away party" for the family with relatives, friends, or the religious community because everyone recognized that the family was coming home to Israel at the conclusion of the temporary post-doctoral fellowship.

45. The family initially proceeded as agreed with the temporary post-doctoral fellowship in Ohio.

46. The Mother began her temporary post-doctoral fellowship at Case Western Reserve University. The children attended school. And the Father began looking for a temporary Talmudic scholar position in Ohio so that he could continue his studies during the temporary time abroad.

47. The Father struggled to find a Talmudic scholar program he could join in Ohio primarily because of the temporary nature of the family's time in Ohio. Upon information and belief, Talmudic scholar programs generally prefer to have scholars who intend to remain in the local community long-term. The Father eventually was partially accepted into a program but he is paid an even lower rate stipend than he would earn if he had been fully accepted into the program—and the stipend is paid under the table.

48. Soon after arriving in Ohio and starting the family's new temporary routine and temporary life here, the parties' marriage began to break down.

49. The parties attempted marriage counseling in an effort to keep their marriage and family together.

50. After several months of attempting counseling, the parties separated in April 2019 and now each live in separate temporary homes in the Cleveland area. The Mother and children continue to live temporarily in the temporary home the Mother organized for the family when they first arrived in Ohio. The Father has moved into a temporary room above a house that has been converted to a synagogue in the Cleveland area.

51. In May 2019, after the parties' relationship had broken down, the Mother approached the Father to discuss renewal of the children's passports (the children are dual citizens of Israel and the United States).

52. The parties' daughter, S.G., was registered for summer camp in Israel during the summer of 2019 (which she had also attended in 2018), and it was therefore imperative that her passports be renewed immediately. Their son's passports also needed to be renewed and the Mother suggested to the Father that all passport renewals be accomplished at the same time.

53. The Father refused to cooperate in renewing the passports. The position he articulated to the Mother was that he would not cooperate with the renewals because he believed the Mother would take the children to Israel and not return to Ohio.

54. The Mother did not understand the Father's position because the family's plan has always been to stay in Ohio until the Mother's temporary post-doctoral fellowship concludes at the end of January 2020. Thereafter the parties had agreed that the family would return home to Israel.

55. The Father's fear that the Mother would stay in Israel with the children therefore did not make sense to the Mother because she of course planned to complete her temporary post-

9

doctoral fellowship and then return home to Israel at the end of January 2020 as had always been the family's plan.

56. With the assistance of a therapist and mediator, the Mother and Father ultimately worked out an agreement for renewal of the passports to that S.G. could attend her summer camp in Israel during the summer of 2019.

57. But after the passports had been renewed, the Father took possession and control of the passports for the parties' son, Z.G. The Father refuses to disclose the precise location of Z.G.'s passports to the Mother. Upon information and belief, the Father has hidden Z.G.'s passports at a friend's home.

58. On or about May 24, 2019, the Mother learned that the Father had taken and hidden Z.G.'s passports. When she confronted the Father about Z.G.'s passports and demanded that the Father return the passports, the Father told the Mother that he no longer agrees to the children returning home to Israel at the end of the her temporary post-doctoral fellowship at the end of January 2020.

59. The Father told the Mother that the children are not returning to Israel at the conclusion of the temporary post-doctoral fellowship at the end of January 2020 and that the Father has made the unilateral decision to remain with the children in the United States. The Father has thereby repudiated the parties' shared agreement for the children to return to Israel at the conclusion of the temporary post-doctoral fellowship in the United States.

60. During this conversation on or about May 24, 2019 the Mother learned for the first time the true nature of the Father's plan in Ohio–namely, that the Father has unilaterally decided that the children are not returning to Israel and that the Father has repudiated the parties' agreement

for the children to return to Israel at the conclusion of the temporary post-doctoral fellowship in the United States.

61.     The Father is therefore keeping Z.G.'s passports from the Mother to prevent her from taking the children home to Israel at the end of her temporary post-doctoral fellowship at the end of January 2020.

62.     Although the Mother has possession of S.G.'s passports, the Father knows she cannot realistically return home to Israel with one child, leaving the other child behind in Ohio.

## COUNT I – WRONGFUL RETENTION

63.     The Mother restates and re-alleges the allegations contained in Paragraphs 1 through 62 as if fully set forth herein.

64.     The Hague Convention applies to cases in which a child under the age of sixteen (16) years has been removed or retained from his or her habitual residence in breach of rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the children.

65.     The children here are under the age of 16.

66.     The retention of the children in the United States from Israel began on or about May 24, 2019 –the date the Father told the Mother: (a) that the children are not returning to Israel at the conclusion of the temporary post-doctoral fellowship at the end of January 2020; (b) that the Father has made the unilateral decision to remain with the children in the United States, thereby repudiating the parties' agreement for the children to return to Israel at the conclusion of the temporary post-doctoral fellowship in the United States; and (c) that the Father has taken and

hidden Z.G.'s passports, thereby preventing the Mother and children from returning home to Israel at the conclusion of the temporary post-doctoral fellowship at the end of January 2020.

67. The habitual residence of the children is Israel and was Israel on the date the Father retained the children in the United States.

68. The children have each lived in Israel since their respective births in 2009 and 2014.

69. The parties have only ever had a shared, settled intent for the children to reside in Israel. They have never had a shared intent for the children to live anywhere other than Israel. The parties agreed for the children to have a temporary sabbatical in the United States for a period of approximately two years during the Mother's temporary post-doctoral fellowship, at the end of which the children would return to Israel. The parties never agreed for the children to live outside Israel indefinitely or permanently.

70. The children's presence in Israel has a degree of settled purpose from the children's perspectives. Before taking the temporary sabbatical trip to the United States, the children were fully involved in Israeli family life, community life, school life, and religious life. The children attend play groups, play dates, and birthday parties in Israel. The children attend religious services and celebrations in Israel and participate in regular religious practices in Israel. The children have extended family and friends in Israel. The children have lived their entire lives, except for this temporary sabbatical trip, in Israel.

71. The Mother and Father are both fully involved in the children's school lives, community lives, religious lives and family, and social lives in Israel. Both parents participate in decision making with respect to the children's lives in Israel.

72. At the time of the Father's retention of the children in the United States from Israel on or about May 24, 2019, the Mother had—and continues to have—rights of custody to the children under Israeli law.

73. In Israel, pursuant to Section 14 of the Law of Legal Competence Guardianship (1962) (hereinafter, the "Law") both parents are the legal guardians of their minor children. This status continues until such time as there is a legal ruling that defines otherwise, or there is an agreement by the parents that was approved by the court system that defines otherwise. As such, both parents are the natural legal guardians of their minor children, and both of them have custody of their minor children.

74. Section 25 of the Law specifically states that barring an agreement that determination the custody of children under the age of 6, the best interests of the child require that they be with their mother (i.e. the mother is the custodial parent) unless there are special reasons for the court to issue a different decision.

75. The Israeli Supreme Court has also determined that along with guardianship over their minor children, both parents have legal custody over their minor children until such time as a judicial decision (which can be the affirmation of an agreement) determines otherwise.

76. The Israeli Supreme Court, in its recent *Ploni v. Ploni* case, has held and explained that "the parents are the natural legal guardians of their minor children (Section 14 of the Legal Competence Law). The legal guardianship includes the obligation of the obligations and rights connected with the needs of the minor such as: education, preparing him for a trade (Section 15 of the Legal Competence Law). Together with that, parental guardianship bestows upon the parents the right of custody over the child and (the right to) determine where he will reside. Whereas the

first part of the definition of legal guardianship, usually refers to legal guardianship, the second part of the definition, regarding custody and determining the child's place of habitation is generally defined as physical custody." (internal quotations omitted).

77. In accordance with the Law and continued Supreme Court rulings in Israel, inasmuch as neither party has acquired a judicial opinion stating otherwise, the Mother, together with the Father, is the legal guardian for and has full custodial rights over the parties' children, S.G. and Z.G.

78. The Mother has the rights of custody described herein by operation of law even without any orders being entered relating to the children by any Israeli courts, and she had these rights at the time of the Father's unilateral retention of the children in the United States.

79. At the time of the Father's retention of the children in the United States, the parties had (and continue to have) the joint legal guardianship and custodial rights over the children by operation of law in accordance with Israeli law as fully set forth above.

80. There are no court orders entered by any court anywhere in the world relating to the children in this case.

81. The rights and responsibilities of a person with joint guardianship rights and joint custodial rights as set out above under Israeli law necessarily involve the "care of the child" and are therefore rights of custody under Article 5*a* of the Hague Convention.

82. Joint guardianship rights and joint custodial rights as set out above are "rights of custody" under Article 5*a* of the Hague Convention.

83. The Mother here, as a holder of joint guardianship rights and joint custodial rights under Israeli law, did not ever consent for the Father to retain the children in the United States.

84. The Father's retention of the children in the United States is in breach of the Mother's rights of custody under Israeli law and is therefore wrongful.

85. Notice is given in this pleading that the Mother is relying upon foreign law. Fed.R.Civ.P. 44.1.

86. At the time of the Father's retention of the children in the United States from Israel, the Mother was actually exercising her custody rights within the meaning of Articles 3 and 5*a* of the Convention, in that she is the mother of the children and she has actively participated in every aspect of the children's lives since each of their births.

87. The Mother has never consented or acquiesced to the retention of the children in the United States from Israel.

88. The Mother has promptly taken all legal steps available to her to seek the return of the children to Israel.

89. On November 5, 2019, the Mother filed an action in the Municipal Rabbinical Court of Jerusalem seeking, *inter alia*, an order for the Father to return Z.G.'s passports, or in the alternative, authorizing the Israeli Population and Immigration Authority to issue a replacement Israeli passport for Z.G.

90. The children are currently physically located within the Northern District of Ohio the Mother at 3706 Bendemeer Road, Cleveland Heights, Ohio 44118.

### COUNT II – ARTICLE 18 RETURN

91. The Mother restates and re-alleges the allegations contained in Paragraphs 1 through 90 as if fully set forth herein.

15

92.     The Mother invokes Article 18 of the Convention, which grants this Court plenary power to order the children's return at any time.[4]

93.     In accordance with the Article 18 equitable return factors set forth in Justice Alito's concurring opinion in *Lozano v. Montoya Alvarez*, the Father requests that this Court exercise its equitable discretion to return the children to Israel under Article 18 even if the Father establishes one of the Convention's five narrow discretionary exceptions to return under the Convention.[5]

94.     The children here have an interest in returning to Israel, their country of habitual residence.

95.     The children have close ties with Israel; in particular, they have close ties to their Mother, extended family members, neighbors, religious community, and friends in Israel.

96.     The Mother has an interest in exercising her Israeli rights of custody in Israel, which she was doing in Israel before the start of the temporary post-doctoral fellowship in the United States. The Mother is further exercising her Israeli rights of custody in the United States during the temporary post-doctoral fellowship.

97.     The Governments of Israel and the United States both have an interest in discouraging inequitable conduct and deterring international child retentions.

---

[4] *See* Convention, art. 18; *see also* 51 Fed. Reg. 10,494, 10,509 (1988) (legal analysis of the Hague Convention by the U.S. Department of State); *Lozano v. Alvarez*, 134 S.Ct. 1224, 1237 (2014) (Alito, J., concurring); *In re B. Del C. S. B.*, 559 F.3d 999, 1015-16 (9th Cir. 2009); *Alcala v. Hernandez*, 826 F. 3d 161 (4th Cir. 2016).

[5] *See Lozano*, 134 S.Ct. at 1237 (Alito, J., concurring) (listing factors that weigh in favor of returning a child to the country of habitual residence even when a narrow discretionary exception to return is established).

## PROVISIONAL AND EMERGENCY REMEDIES[6]

98. The Mother requests that the Court issue a Show Cause Order forthwith ordering the appearance of the Father before this Court on the first available date on the Court's calendar, and directing the United States Marshal to serve the Show Cause Order on the Father forthwith.

99. Pursuant to ICARA § 9004, in a proceeding for the return of a child, "[n]o court exercising jurisdiction … may … order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied." ICARA § 9004. In this case, the law referred to is that of the State of Ohio.

100. In the State of Ohio, the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") is the source for statutory law governing, *inter alia*, the resolution of both domestic and international child custody disputes and is codified as the Ohio Rev. Code. § 3127.01 *et seq*. Ohio law addresses the appearance of the parties and the child in such cases in § 3127.24. That section authorizes this Court to order the appearance of the child and custodian or custodians. *Id.* This Court therefore has the authority to issue a show cause order, ordering the appearance of the Mother in that the provisions of 22 U.S.C. § 9004 can be met.

101. The Mother further requests that this Court order, as a part of the Show Cause Order, a provision prohibiting either party from the removal of the children from the jurisdiction of this Court during the pendency of the proceedings in this Court, taking into possession all of the

---

[6] This Court "[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition." ICARA § 9004.

children's travel documents, and thereafter entering a Scheduling Order setting an expedited hearing on the Verified Petition for Return of Children to Israel.

## UCCJEA DECLARATION

102. The details regarding the minor child that are required to be provided under the UCCJEA are as follows:

    A.    From on or about January 30, 2018 through present, the children have been physically located at 3706 Bendemeer Road, Cleveland Heights, Ohio 44118 during the period of the Mother's temporary post-doctoral fellowship, initially with both parties and from April 2019 to present with the Mother;

    B.    From shortly after S.G.'s birth in 2009 and continuing after Z.G.'s birth in 2014 until present, the children have lived at 24 Kfar Ivri, Apt. 3, Neve Yaakov, Jerusalem, Israel, with both parties.

    C.    The Mother does not have information of any custody proceeding concerning the children pending in any other court of this or any other State.

    D.    The Mother does not know of any person, or institution, not a party to the proceedings, which has physical custody of the children or claims to have rights of parental responsibility or legal custody or physical custody of, or visitation or parenting time with the children.

## NOTICE OF HEARING

103.   Pursuant to ICARA § 9003(c), the Father will be given notice of any hearings in accordance with Ohio's UCCJEA.[7]

## ATTORNEYS' FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007

104.   The Mother has incurred substantial expenses as a result of the wrongful retention of the children by the Father. The Mother will submit a copy of all expenditures as soon as practicable and possible and will amend these costs, from time to time, according to proof and in light of further expenditure required because of the Father's wrongful retention.

105.   The Mother respectfully requests that this Court award all reasonable and necessary expenses and reduced fee attorneys' fees and costs incurred to date as required by ICARA § 9007, reserving jurisdiction over further expenses.

## RELIEF REQUESTED

**WHEREFORE**, Petitioner, Michelle A. Gordon, respectfully requests the following relief:

A.   That this Court issue an Order directing the prompt return of the children to their habitual residence of Israel in accordance with Petitioner's rights of custody under Israeli law and Articles 3, 5*a* and 18 of the Convention;

B.   That this Court issue a Show Cause Order forthwith, scheduling an initial show cause and scheduling hearing on the first available date on the Court's calendar;

---

[7] The Convention itself does not specify any specific notice requirements. ICARA provides that notice be given in accordance with the applicable law governing notice in interstate child custody proceedings. ICARA § 9003(c).

C. That this Court's Show Cause Order also include a provision ordering that neither party may remove the children from this Court's jurisdiction during the pendency of these proceedings, and taking into the Court's possession all of the children's passports and any other travel documents;

D. That this Court's Show Cause Order be served on the Respondent by the United States Marshal Service;

E. That this Court issue an Order directing the Respondent to pay the Petitioner's reasonable and necessary expenses, including but not limited to attorneys' fees, suit money, expenses, and costs; and

F. That this Court grant any such further relief as justice and the Petitioner's cause may require.

**VERIFICATION**

PURSUANT TO 28 U.S.C.A. §1746, I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON NOVEMBER 13, 2019.

Michelle A. Gordon
*Petitioner*

/s/ Kelly A. Powers
Stephen J. Cullen
Kelly A. Powers
Leah M. Hauser
Miles & Stockbridge P.C.
1201 Pennsylvania Avenue N.W., Suite 900
Washington, D.C. 20004
(202) 465-8374 (tel.)   (410) 385-3709 (fax)
scullen@milesstockbridge.com
kpowers@milesstockbridge.com
lhauser@milesstockbridge.com

*Attorneys for Petitioner*